# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01442-MSK-NRN

LIDIA CUCURULL-ECTOR,

a Colorado Resident

       Plaintiff

v.

WILBUR L. ROSS,

Secretary of the United States Department of

    Commerce Defendant

## COMPLAINT

## JURISDICTION AND VENUE

1. Plaintiff Lidia Cucurull-Ector is a Colorado resident. She resides at 1011 North Cedar Brook Road, Boulder, Colorado 80304. She is an employee of United States Department of Commerce, National Oceanic and Atmospheric Association. At all relevant times, she was a resident of Colorado.

2. Defendant is the Secretary of the United States Department of Commerce, sued in his official capacity as head of that agency.

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and §1343, and this action is authorized and instituted pursuant to 29 U.S.C.

§626(c).

4. Venue is proper in this Court as the unlawful employment practices were committed within the jurisdiction of the United States District Court for the District of Colorado.

5. Ms. Cucurull timely filed an EEO complaint with the Department of Commerce, Office of Civil Rights on May 24, 2017, and thereafter amended that complaint on several occasions to include the discriminatory and retaliatory actions sued upon. More than 180 days have passed since that complaint was filed, and the agency has not issued a final decision. She has therefore exhausted her administrative remedies as set forth in 29 C.F.R. Part 1614, including 29 C.F.R. § 1614.408.

## FACTUAL ALLEGATIONS

6. Late 2013 was a difficult time for Ms. Cucurull. She had a miscarriage, was caring for a young child, and her marriage was suffering. At that time, she was a Cooperative Institute employee and her federal supervisor was Kevin Kelleher, then director of the NOAA/OAR/ESRL/Global Systems Division and current head of NOAA/OAR/ESRL Boulder. Mr. Kelleher was aware of some of the challenges that she was facing and used his position of authority to express an interest in her. In late 2013-early 2014 he would regularly stop by her office, close the door, and sit close to her. He would often ask about her personal life and tell her that he wanted them to be closer.

7. On February 5, 2014, Mr. Kelleher and Ms. Cucurull were attending the AMS banquet dinner. After she had several drinks, they were intimate. He was also married at the time. A few days after this encounter Mr. Kelleher insisted that they

become involved on a regular basis. Ms. Cucurull was ambivalent, but because he was her supervisor, she had difficulty telling him no.

8. Beginning on February 9, 2014, and continuing throughout the year, Mr. Kelleher tried to persuade Ms. Cucurull to leave her husband. Kelleher falsely accused her husband of hiding money from her and being dangerous. During this time, she started to believe that, because Mr. Kelleher was in a position of authority, her job was potentially in jeopardy if she did not continue the relationship with him. However, on March 3, 2014, she received an anonymous email from a co-worker warning her that if her relationship with Mr. Kelleher continued her career would suffer. Amidst these conflicting concerns, the relationship continued.

9. In early 2015 Ms. Cucurull and her husband separated. Several times throughout the year she also attempted to end the relationship with Mr. Kelleher, but each time he became more insistent that it continue, buying her gifts, cards, and sending her affectionate text messages, hand-written notes, and emails.

10. In August 2015, Ms. Cucurull became a federal employee, and Mr. Kelleher became her direct federal supervisor. Later that year, she and her husband reconciled, angering Mr. Kelleher.

11. On February 29, 2016 via text message to Mr. Kelleher, Ms. Cucurull made explicit her desire to end their relationship, writing, "I don't think you are the kind of man I can be happy with. I am sure you will not have any trouble finding someone else…" Nevertheless, he continued insisting on having sexual relations with her. On March 1, 2016, he invited himself to her house claiming that he needed to talk to her. She

again felt that her job was in jeopardy if they did not sleep together, which they did that evening. A few days later, she told him to stop sexually harassing her.

12. Despite her clear desire to end the relationship, Mr. Kelleher continued to subject Ms. Cucurull to unwanted attention. On March 12, 13, 14, 15, 16, 18, 20, 23, 24, 27 and June 15, 2016 he sent her texts calling her "babe" or "baby." On May 19 and September 26, while she was out of the office, he drew smiles and wrote "welcome back" on her white board. He continued subjecting her to this type of unwanted attention throughout the year.

13. In addition to this unwanted attention, over the course of 2016, it became clear that Mr. Kelleher was subjecting Dr. Cucurull to adverse treatment because she had ended their relationship and opposed his continued harassment. In March 2016, he accused her of a conflict of interest. In June 2016, he interfered with work-related negotiations she was conducting. And he regularly excluded her from management meetings.

14. On October 6, 2016 Ms. Cucurull again told Mr. Kelleher to stop sexually harassing her. Afterwards, his retaliation against her intensified. Later that month he tried to force her to keep a toxic employee on her team, resulting in her filing a formal grievance against him on November 10. He continued to exclude her from meetings. On December 16, 2016 he attempted to delay the review process for a paper she had submitted for peer review.

15. In late 2016-17, in an attempt to escape from Mr. Kelleher, Ms. Cucurull sought transfer to another OAR lab. On January 27, 2017 in an attempt to continue

controlling her, he wrote a memo requesting that he retain supervisory authority over her by being allowed to give input into her performance appraisal. He sought this supervisory authority over her even though the transfer would mean that she was no longer officially reporting to him.

16. On February 14, 2017, Ms. Cucurull complained to Human Resources about Mr. Kelleher's sexual harassment and retaliation against her. As a result, she was transferred to another lab, AOML in Miami, despite a governmental 'hiring freeze'. As part of the transfer, it was agreed that she would remain in charge of the GOSA group in Boulder, which she created. The following month, although she was no longer working under him, he attempted to force her to accept a spending plan for funds that she had brought into her group. His plan required her to use those funds to pay her salary, and he threatened her job by saying that the funds would be sent to a contractor if she did not accept his proposal. As a result of this disagreement, he took a NESDIS project away from her and has hired a contractor to do her work. He has also tried to hide funds from her and falsely accused her of improperly using GSD funds.

17. On May 24, 2017, Ms. Cucurull made a formal EEO discrimination and retaliation complaint regarding the actions alleged in paragraphs 6-16 of this complaint.

18. On May 25, 2017, it was also agreed that Dr. Cucurull, as part of her supervisory duties at GOSA, would sponsor a foreign national, Vanderlei Rocha de Vargas, Jr. On July 27, 2017, this sponsorship was removed from her by Mr. Kelleher's deputy, Jennifer Mahoney, who was acting at his behest. On July 29, 2017, Mr.

Kelleher, again acting through Ms. Mahoney, began attempts to have Dr. Cucurull removed from her leadership role over GOSA.

19. Contemporaneously, in order to limit his contact with Dr. Cucurull, Mr. Kelleher was instructed not to interact with any GOSA employees, because those employees are supposed to work under her. However, on August 3, 2017, she learned that he had met with two GOSA scientists, Karina Apodaca and Andrew Kren, in attempts to solicit negative information about her.

20. In early September, 2017 Mr. Kren was pressured to withdraw a research proposal and was told that he was being treated like a "pawn" in a dispute between Mr. Kelleher and Dr. Cucurull. At Mr. Kelleher's behest, he was then pressured to leave GOSA and stop working with Dr. Cucurull, allegedly because she "probably won't survive" as a NOAA employee.

21. On October 6, 2017, Ms. Mahoney sent an email to Dr. Cucurull's direct supervisor, informing him that GSD was cutting GOSA's funding by $100,000 for the coming year.

22. On October 18, despite the earlier agreement that Dr. Cucurull, "remains head of GOSA," Ms. Mahoney emailed Robert Atlas and stated that Dr. Cucurull was being removed as science advisor for all GOSA Cooperative Institute employees. Ms. Mahoney stated that she would become the science advisor for these employees, even though she is not part of the group and not scientifically qualified for the role. She went on to state that Dr. Cucurull could now only "guide the science" of GOSA and that "GOSA CI employees are not her employees." In that same email, Ms.

Mahoney further undermined Dr. Cucurull's authority by stating that she would no longer be able to sponsor foreign nationals working in GOSA, and that going forward all foreign nationals working in Dr. Cucurull's group would have to be sponsored by a GSD staff member.

23. Also, on October 18, 2018 in a separate email, GOSA Cooperative Institute employees Dr. Kren and Dr. Apodaca were told that although they would still "coordinate" their travel with Dr. Cucurull, their supervisor, all travel requests would have to be approved by three additional people outside GOSA, including Ms. Mahoney. Three other GOSA employees later received a similar directive.

24. During this same timeframe, Ms. Mahoney told Dr. Atlas that GSD was attempting to rid itself of GOSA and physically remove the group from the premises, allegedly because its work is no longer in "alignment" with GSD's mission.

25. On approximately November 1, 2017, Ms. Mahoney told GOSA administrative assistant Becky Carlson that Ms. Mahoney was now the supervisor of all GOSA Cooperative Institute employees, and that Ms. Carlson should stop supporting the GOSA group.

26. At approximately the same time, Dr. Cucurull contacted NWS to inquire about office space for GOSA, so that she would no longer have to share space with GSD, and so she could provide space for her subordinates, Ms. Apodaca and Mr. Kren. She initially was told by NWS that it could lease to her. However, on November 8, a few days after GSD learned of her attempts to move, NWS's offer was revoked.

27. During this timeframe, Dr. Cucurull began seeking treatment for Post-Traumatic

Stress Disorder ("PTSD") caused by Defendant's discrimination and retaliation against her.

28. On November 10, 2017, Ms. Mahoney emailed Dr. Atlas and falsely claimed that Dr. Cucurull was compromising security by continuing to sponsor Dr. Apodaca as a foreign national, something that Dr. Cucurull had done without incident since Dr. Apodaca first began working for her over one year ago.

29. In that same November 10 email, Ms. Mahoney wrote that Dr. Apodaca's "access to the building…will likely come to an end at the end of December." Ms. Mahoney wrote this even though beginning January 1, 2018 Dr. Apodaca was to be transferred out of GSD and into AOML, beyond Ms. Mahoney's authority. Moreover, neither Ms. Mahoney, nor anyone else at GSD has the authority to bar Ms. Cucurull's CI employees from NOAA's Boulder facilities

30. December 4, 2017, Dr. Cucurull was notified by the DOC Office of Inspector General that a complaint had been filed against her. After meeting with the Administrative Officer assigned to investigate the complaint, it became obvious that it was made by either Mr. Kelleher or one of his allies in retaliation for her reporting him for sexual harassment.

31. On approximately December 19, 2017, because the Department of Commerce had failed to protect her from ongoing retaliation from Mr. Kelleher and Ms. Mahoney, and in an attempt to oppose that retaliation that she was being subjected to, Ms. Cucurull sent an open letter to her colleagues explaining the actions that had been taken against her.

32. At approximately the same time, the Department, acting through Kelleher and Mahoney, refused to lease available office space to Ms. Cucurull for her employees.

33. On January 9, 2018, while attending a conference in Austin, Dr. Cucurull learned that Mr. Kelleher was telling her work associates that she had made seven complaints against him, all of which were allegedly found to be baseless. Given that investigation of her EEO complaint was ongoing at that time, and no finding had been issued, this false statement was an obvious attempt by him to retaliate by discrediting her.

34. During that same January 2018, trip, Mr. Kelleher engaged in stalking behavior towards Ms. Cucurull by: loitering near her, staring menacingly at her, following her around the airport, and following her around the airport's parking lot.

35. Contemporaneously with these events, the Department repeatedly refused to act on Ms. Cucurull's outstanding request to change her duty station from Miami to Boulder, even though she has worked at the Boulder location for years, and such transfers are routine.

36. Continuing through the winter and spring the Department continued to deny Ms. Cucurull the opportunity to lease available office space to house her GOSA employees.

37. On May 14, 2018, Ms. Mahoney again attempted to deny Ms. Cucurull's subordinate Mr. Kren entry into NOAA's Boulder facility, falsely claiming to security personnel that he had been fired and was not allowed into the building. On May 22,

the Department again blocked Mr. Kren's access to the building, preventing Ms. Cucurull from working with him.

38. On June 27, 2018, only 19 days after this lawsuit was filed, Defendant's Deputy Assistant Administrator Gary Matlock denied Ms. Cucurull's request to change her duty station to Boulder.

39. Shortly thereafter, Ms. Cucurull learned that Defendant was attempting to remove her from the premises. Thus, on October 1, 2018 as a reasonable accommodation of her PTSD, she requested that she be allowed to remain in her office and supported her request with a letter from her therapist. On October 12, 2018, Defendant's Assistant Administrator Craig McLean wrote in an e-mail that instead of allowing her to continue to work in her office, she was to work at home. In the same e-mail, he also wrote that he was only going to allow her to do so "contingent upon constructive negotiations toward settlement of the ongoing legal dispute." That same day, he approved removing Ms. Cucurull from her office.

40. On October 16, 2019, Defendant locked Ms. Cucurull out of her office. The next day, Mr. Matlock approved removing her belongings, an order that was to be carried out in part by Penny Granville, Defendant's Administrative Officer. On October 18, Ms. Granville was contacted by Debbie Ferrara, Defendant's own Reasonable Accommodation Coordinator. In an email to Ms. Granville, Mr. McLean, and Mr. Matlock, Ms. Ferrara "strongly advised" them not to remove Ms. Cucurull or her possessions from her office. Nevertheless, Defendant did. Later that day, Jennifer Mahoney met with Defendant's security personnel and had Ms.

Cucurull's access to the building blocked, falsely claiming that doing so was necessary for "the safety and security of the other 1,000 tenants in the building."

41. On February 25, 2019, Dr. Cucurull learned that she was passed over for a position as OAR representative to the Joint Center for Satellite Data Assimilation.

**FIRST CAUSE OF ACTION**
**SEX DISCRIMINATION AND RETALIATION**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000e-2**

42. Defendant engaged in unlawful employment discrimination against Cucurull by subjecting her to a hostile work environment based on her sex and her engagement in protective activities, and by retaliating against her for complaining and opposing sexual harassment and retaliation and the hostile work environment it created

43. The harassment of Ms. Cucurull was severe and pervasive, unwanted, offensive to a reasonable person, and substantially altered the conditions of her employment.

44. Ms. Cucurull's gender and protected activities were the substantial motivating factors in Defendant's discrimination and retaliation against her.

45. Defendant's actions, or lack thereof, against Ms. Cucurull were in violation of 42 U.S.C. §2000e *et seq.*, particularly 42 U.S.C. §2000e(k).

46. Ms. Cucurull was injured and deprived of her rights as a result of Defendant's actions against her, or lack thereof.

47. Defendant acted with reckless indifference to Ms. Cucurull's rights in its discrimination against her.

48. Ms. Cucurull has suffered damages in an amount to be shown at trial as a result of

Defendant's actions or lack thereof.

49. Ms. Cucurull is entitled to compensation for back pay, front pay, lost benefits, reinstatement, emotional distress, attorneys' fees and costs, interest and other equitable relief.

## SECOND CAUSE OF ACTION
## DISABILITY DISCRIMINATION AND RETALIATION
### REHABILITATION ACT
### 29 U.S.C. § 794

50. As a person diagnosed with Post-Traumatic Stress Disorder, Ms. Cucurull-Ector has a disability.

51. Ms. Cucurull-Ector is qualified for her job.

52. Defendant subjected Ms. Cucurull-Ector to adverse actions in the form of removing her from her office.

53. Defendant's actions were retaliatory, discriminatory, and constituted a failure to accommodate.

## DEMAND FOR JUDGMENT

Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant's and award her all relief as allowed by law, including, but not limited to, the following:

   a. Actual economic damages as established at trial;
   b. Compensatory damages including, but not limited to, those for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

    c. Punitive damages;

    d. Pre-judgment and post-judgment interest at the statutory rate;

    e. Attorneys' fees, costs and expenses; and

    f. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this June 7, 2019.

Paul Maxon, attorney for Plaintiff

   /s/ Paul Maxon

Paul Maxon (Atty. Reg. # 37251)
The Law Office of Paul Maxon, P.C.
4450 Arapahoe Ave.
Boulder, CO 80303
Telephone: (303) 473-9999
E-mail: paulmaxon@maxonlaw.com

Attorney for Plaintiff Lidia Cucurull-Ector